Case No. 18-5315, Debra Stowe Appellate v. William P. Barr, Attorney General, U.S. Department of Justice. Ms. Husserl for the appellate, Mr. Shanker for the appellate. Mr. Shanker. Good morning, Your Honors. May it please the Court, on behalf of Appellant Debra Stowe, my name is Susan Huda from the law firm of Outman & Golden. This appeal presents two questions for the Court to decide. The first is whether a reasonable jury could find that Ms. Stowe was substantially better qualified for the Division Director position than the younger male selectee, Mark Green. If, as we argue, a jury could so find, this was all the evidence that Ms. Stowe needed to survive summary judgment and present her claims to a jury. Second, even if a jury were to conclude that Stowe was not substantially better qualified than Mr. Green, could that same jury find in her favor based on her superior qualifications combined with the other evidence of discrimination and pretext in this record? Again, we argue that the answer is yes, and thus there are at least two evidentiary paths by which a jury could find discrimination in this case. Regarding Stowe's evidence that she was substantially superior, or she was substantially better qualified than Mr. Green, perhaps the most compelling evidence of her substantially superior qualifications was that she had been performing most, if not all, of the newly revised Division Director responsibilities for many years. The selectee, Mark Green, testified that once he became Division Director, about 75% of his time was spent on responsibilities that he took over from Ms. Stowe. When you say newly revised, wasn't it sometime after Mr. Green took on the job that, for example, the grant-making responsibilities were taken away? That wasn't clear at the time of this promotion decision, was it? On that aspect, you're right, Your Honor, but what I refer to is that there was a Division Director position that a gentleman named Mr. Hart held from 2010 to 2014, and prior to the 2014 selection, Mr. Tillery actually rewrote that job description. The selecting official, Mr. Tillery, told his supervisors that the Division Director vacancy provided him with an opportunity to, quote, unquote, regrade Stowe's position. A reasonable jury could find here that that's exactly what he did. It is undisputed that all of Ms. Stowe's GS-15 responsibilities were transferred over to the Division Director position. These responsibilities included, at a minimum, Ms. Stowe's oversight of the Division's standards development and standards testing programs, as well as her service on the Interagency Committee on Standards Policy, or the, recalling our briefs, the ICSP. That's interesting. The way you just put it, you don't have a discriminatory demotion claim in the case, do you? And you're right, Your Honor, but we could. I mean, in theory, you could argue that that was an effective demotion. The failure to select her, and, of course, Ms. Stowe testified, consistent with Mr. Green, that once the selection happened, she was left with almost nothing to do. And it is undisputed here that Stowe's performance of these responsibilities for year over year was extraordinary. Stowe didn't just successfully oversee the standards development and testing programs. These programs didn't even exist at the time Stowe joined the Division. Stowe's supervisors credit her with creating those programs, programs they repeatedly describe as revolutionary and a gold standard. In contrast, Green had only worked on a couple of aspects of those programs for a couple of years under Stowe's direction. Indeed, a jury could find Stowe substantially better qualified with respect to every aspect of that Division Director role. As for service on the ICSP, the interview panel actually concluded that Green wasn't qualified to serve on the ICSP and that he shouldn't even be interviewed for that reason. It was only due to an internal policy and the strength of Stowe's own application that got him to the interview stage at all. Ms. Sutton, you said at the beginning of your remarks that you had two theories. And I think what you said was that even if looking at the record, we couldn't conclude that she was substantially or significantly more qualified, it was just close, you still have a path to victory here, right? That was what you told us. Correct. And I'd like to hear you talk about that a little bit, and specifically your argument that Tillery designed the selection process and the questions to disadvantage the plaintiffs. Could you talk about that a little bit? Absolutely, Your Honor.  Tillery, who I know the district court described the evidence that Ms. Stowe presented, a reasonable jury could find that he had demonstrated pernicious sexism toward Ms. Stowe and other women in the divisions. He orchestrated this entire selection process. He rewrote the job description, selected the panelists, drafted and weighted the interview questions. Never mind. I was about to say, up until your last phrase, that would all be okay if the questions were objective, correct? That's why I asked you to focus on the question, your allegation that he designed the questions to disadvantage the plaintiff here. So you're absolutely right. That's critical to your case, that allegation. It is absolutely critical to our case in finding a pretext, and our allegation that it was not administered fairly. You're absolutely right. These questions asked the candidates to, quote, unquote, describe a situation in which you have. And then it went on to provide even a more watered-down solicitation of information that a reasonable jury could find was designed to distract from Stowe's superior qualifications. What would a question look like that enabled her to demonstrate her superior qualifications? What would that question look like? So, for example, discuss in detail your experience running a standards development and standards testing programs. How much actual supervisory responsibilities have you performed in the past? What interagency executive-level committees have you ever served on, if any? Wouldn't the government's response to that be, well, we can find all that information in the papers, in her application. We know her history. What these four or five questions are designed to do is to give us a sense of how she would actually behave in a decision-making process. Well, you know, first of all, I think a jury could look at these as reasonable questions, and I can imagine they're not, you know, to ask for one example is not per se as a matter of law illegal. We don't argue it is. But the evidence of his sexism and the multiple means by which this process was designed to disadvantage her, and it wasn't simply the phrasing of the questions. That was one important aspect, but not the entire aspect. So you talk about the questions and their administration as key. I found it striking in reading the record that in hiring Mr. Hart, is that prior? Correct. Over Ms. Stowe, that Mr. Tillery did not use this sort of bifurcated process where you meet a threshold of qualification and then it's all based on the interview. And my sense was that Mr. Hart was not a particularly charismatic candidate, and then faced with someone quite different, that I thought this was part of your case, faced with someone quite different that he wished to promote, who was quite junior, but maybe more of a salesman, that it becomes a threshold and then interview only. But I heard you almost to disavow that as part of your theory. No, Your Honor. We don't disavow that, right? When you read the Tillery's 2010 selection memo, the memo justifying his rationales for picking Hart, first of all, he relies predominantly on Hart's supervisory experience and Stowe's relative lack in that area. Of course, writes how Stowe, in fact, had quite a substantially greater responsibilities in the division, but he doesn't. There's no reference that this decision was based exclusively on relative interview performance, and the interview performance isn't even mentioned in that selection memo at all. So you're right, Your Honor. We argue that that is evidence, again, this totality of evidence from which we believe a jury could find the supposed decision to rely exclusively on interview performance here quite suspect. Can you describe a little bit about what you understand the job to be? There were a couple of these criteria. I found it really hard to tell the difference between one that's technical and one that's standard. You and me both, Your Honor. So the primary responsibilities here are the management of standards development and the standards testing programs. So if I can use an example, I think it's the easiest. So what are the specifications that a bulletproof vest has to meet to meet the Department of Justice standards? That's the standards development program. They issue a standard that tells manufacturers and law enforcement what are the specifications. The standards testing programs, which includes this word conformity assessment that you see in our briefs, is the manner in which the Department of Justice determines whether a manufacturer, once they've made this bulletproof vest, whether it does in fact comply with those standards. It's testing to make sure that the product is as the manufacturer represents. This was the majority of its job. And we get, in the briefs, the lawyers tend to silo the various issues. But running those two programs for as long as Ms. Stowe did, that was her responsibility. That involved central responsibilities involving grants management, for example. That wasn't separate. Those were $30 million in grants that Ms. Stowe oversaw in her capacity running those two programs. The same is true on this sort of separate question of technology policy. The DOJ, the government in its briefs, I don't think has ever identified a technology policy that Mr. Green either developed or implemented himself, whereas Ms. Stowe is recognized. It's undisputed that she developed these standards development and testing programs, which involved myriad development of technology policy. I see that I'm out of time. I just have a quick question for you. Yes. The briefs don't really distinguish very much between the age and the gender allegations. Is that because they rise and fall together? I mean, for example, if we, let's assume for a minute that we actually agreed with you on the gender claims. Do we have to separately address the age claims, or does it just go back at that point for a jury trial? So if I understand Your Honor's question correctly, we argue that under both of our evidentiary paths we offer, certainly if this Court held that a reasonable jury could find Stowe substantially better qualified, that's all that you would need to do to support a verdict on her gender and or her age. On both of them? On both. And what about for your backup position? And on the backup position, we obviously concede that the gender claim is much stronger because in this case we have evidence, multiple points of evidence, but most of the evidence. You're talking about the affidavit. The declarations from the colleagues of sexism. That said, we submit that the other evidence of pretext and discrimination in the record of the unfairly administered process, of the reasons that you could, from the deposition testimony and otherwise, seriously doubt the legitimacy and veracity of each of the panelists' scoring of the candidates, was, along with, by the way, Tillery's shifting rationales that he offered for the decision, that the multiple aspects of the pretext evidence was sufficient to support not only a gender claim but an age claim. All right. Thank you. Thank you very much. Let me just have one more question on that, Shirley. Are you also partly claiming sort of the overlap, that it's because not only is she a woman, but she's 60 as opposed to Ms. Higgins, who's much younger? Or no, Ms. Higgins wasn't younger. Sorry. Ms. Higgins was not younger. Mr. Green, the ultimate selectee, was a substantially younger male. And yes, we would absolutely argue, if this case goes to a jury, that those issues are fluid and that this could have been an issue of not wanting an older woman in the position. Thank you. Yeah. Thank you. Thank you so much. May it please the Court. I'm Assistant U.S. Attorney Dan Schaefer for the appellee, William Barr. Your Honors, I'd like to begin in the same place that Counsel for McStowe began, which is the argument that Ms. Stowe has put forward about the relative qualifications. Can I? I want to ask you to begin somewhere else, if you don't mind, something that at least I think is the core of the case. So when I read the Blue Brief, the claimants' brief, they rely very heavily on three cases from this circuit, which are Hamilton, Salazar, and Iota, I guess you pronounce it, all three cases. Iota. And as I read that, I thought to myself, geez, these look almost controlling, because Iola and Salazar are almost factually indistinguishable. And Hamilton warns on relying on the kinds of subjective standards that were used here. They spent like 18 or 19 pages in their brief on that. And so then I picked up your brief to see what the answer was, and I didn't see any. I mean, you cite the cases, but there's no effort to distinguish those three cases. So, you know, I was wondering, I mean, are you conceding that their description of those three cases is accurate as it applies to this case? No, we're not, Your Honor. Well, maybe you would like to start out by telling me how these three cases are different. Sure. Let me begin first with the Salazar and Iota cases. I mean, did you think they were just irrelevant? Is that why you didn't discuss them? Let me start with the first question, which is why I think those are distinguishable, and then come back to the approach we took in the briefs. Beginning with the Salazar and Iota cases, I'm glad Your Honor raised this issue, because those are the two cases that are distinguishable, because in both those cases what you see there is very strong circumstantial evidence that the decision maker, the hiring official for those positions, had exhibited discriminatory bias prior to the selection process that was at issue. You have just that evidence here in the two declarations. And I want to come back to that in a moment. No, no, no. Why don't you stick with that now? Sure. Because those seem to me to be right in point. Yeah, why don't you start with the – yeah, why don't you just explain why at least the declaration from the other person – I forgot her name. Ms. Crossman. Yeah. It's not at least prima facie evidence of outright gender bias. Well, that type of evidence in the Crossman declaration is much more analogous to the evidence that this Court assessed in the Holcomb case, where they were actually in lesser form of evidence than in the Holcomb case, because there you at least had another employee that had filed an informal complaint of discrimination. Whereas here all you have is one other employee who had never worked under Mr. Tillery, the selection official, until 2017, which is three years after the selection process. Just look at paragraph 8. Frequently. This is the declaration? I have observed him talk to her in a way that I would describe as patronizing, condescending, belittling, and sexist, even though she is one of the most outstanding performers in the office. Chris speaks to Deborah as if she thinks she does not know what she is talking about, though she clearly does. I'm not saying I don't know what a jury would do with that, but why isn't that enough of evidence of discrimination here? I don't understand that. You're talking about getting it to a jury. Where have I? I haven't seen it. The case precedent suggests that this should go to a jury, and I'm still not understanding how you're distinguishing the three cases that my colleague has raised. And it was flabbergasted, I was flabbergasted as well, that you never addressed them. Well, let me begin with the Iowa case. In the Iowa case, you had there an employee who had the selection official who had actually been found in another case to discriminate against the plaintiff. The selection official had been found by the agency in another administrative action to have tried to transfer that plaintiff out of her division because of her perceived discriminatory bias against that employee for foreign language speaking. So that was very, in addition there was evidence in that case that that employee was making remarks about the plaintiff's foreign language communication skills both before and after that finding. So what is the principle that you are teasing out to distinguish that case from this case? There was evidence in the record that the selection official had exhibited discriminatory animus bias. Same information here. It's the kind of thing that should go to a jury? But it doesn't rise to the same level. Why? Because, as I said, you had a finding in another form that that selection official had discriminated. Are you suggesting that declarations like the Crossland Declaration are not probative because they're simply declarations of a person and not supported by a finding of another agency? Do you know of a case that says that? I think that's the Holcomb case, Your Honor. It says that? The Holcomb case. You have to have a prior judgment, an adjudicated judgment, for that kind of information to be credited? No, no. I'm sorry. Maybe you should just read us that part of the case. What I was referring to in the Holcomb case is that, as here, rather, the circuit looked at a number of allegations and claims in that case. And by and large, as is the case in this matter, in the Stowe matter, the allegations and claims that the plaintiff had made were either unsupported by the record, conclusory, or directly contradicted by the record. And that's the case here. The Holcomb court recognized that, in some respects, there were allegations and claims the plaintiff had made that the record supported. But in assessing the evidence in that case, in the totality, the court found that it did not rise to a level sufficient to be a summary judgment. And that's the case here. We recognize that there's another employee, in addition to Ms. Stowe, and that's Ms. Crossland and her declaration, who submitted a declaration that said, by and large, I was not, I did not work under Ms. Utillery until 2017, which is three years after the selection decision at issue here. But I had observed meetings where I, this is Ms. Crossland speaking, where I observed Ms. Utillery speaking, cutting Ms. Stowe off, accepting credit for her ideas. I didn't see him treating other male employees that way. But that's, there's no evidence, number one, connecting the observation she made in the general workplace to the selection process that's at issue here in 2014, for one thing. But there's no specifics. Mr. Schaffer, these are critical questions. And you need to convince us that they're distinguishable, not just to state that they are. He, Utillery, the person Crossland is talking about is the person who designed the selection process and who served on it. So I don't see how you can say that they're not related to each other, that is, that they were stated, that they somehow, Crossland's allegations don't in any way relate to this case. In fact, taking you back to Salazar, that's exactly what happened in Salazar. Salazar had a selection process just like this. And a person participated in the process and, in fact, designed it, who was the assistant to the person, not even the person, but the assistant to the person who had made discriminatory comments. So just tell us as clearly as you can. We're bound by our precedent, right? And to determine whether we're bound by a case, we look at the facts of the case and the statements of the court. And what I'm telling you is that as I look at Salazar, I don't see a way to distinguish this case. The process was virtually identical, and the two aspects of it that we found most significant, that a person participated in the process who had, or was related to someone who had discriminatory, expressed discriminatory feelings, and that the interview questions were designed to disfavor the plaintiff's strengths. We specifically said that in Salazar. And that's what they're alleging here. So just tell me, how do I distinguish it? That's what I'm getting at. Sure. Respectfully, we think that Salazar is easily distinguishable on the facts. Okay. Tell me. Number one reason is that in that case, the plaintiff had made complaints about the selection official and the selection officials, I think they're referred to in the opinion as colleagues, buddies, the selection officials, deputies, had made complaints to the agency in advance of that selection process and said, I think that that individual and the people that he's been putting on these panels is discriminating against Latinos. Okay. The agency said, okay. I understand that that's a factual distinction. But why is it a material distinction in terms of the process, the standard we apply? Because it. Why does that make a difference? There was evidence in that, in the record in that case, and Iowa is similar in this respect, that raised questions about the fairness and legitimacy of the selection process. And the Court, referring back to its earlier language from the fish box decision, said, we think there's something fishy here. The agency had promised to keep. Okay. I hear you. So one distinction is that in Salazar, the plaintiff complained about the person participating in the process, and here the plaintiff didn't. Right? Yes. Is there another distinction? Building from that first distinction is what was starting to look fishy about the selection process. I'm sorry? What was starting to look fishy about the selection process in Salazar and in Ioha, like I said before, had been found to be discriminatory. In Salazar, a little bit different, but the plaintiff had made a complaint in advance. Well, in Ioha, it wasn't even the person who was himself discriminatory. It was his assistant. Right? Or did I mix up the two? I think that's Salazar. That's Salazar. I think that's Salazar. Okay. Sorry. Yeah. Okay. Right. But coming back to Ioha in a minute, the Salazar court said, we think a reasonable jury can infer that this process was unfair and demonstrably discriminatory based on the fact that the agency had made this promise to the plaintiff, and then a process designed to exclude that selection official ended up putting the selection official right at the center of it. Okay. All right. Now, back to Ioha, just very briefly. Yeah. Go ahead. The other piece of evidence that's missing here that was present in Ioha is that there was evidence of undue influence between the tainted official and the other members of the panel. I think there was evidence of the effect of the panelists who were not the most senior member, who was also the alleged discriminator, asking that panel member about more technical questions. Was that a good answer? We don't really know. And that's not the case here. You had... Well, there was a certain... I mean, the record, when you read the depositions, there's a certain amount of deference on the part of the other panelists. This is really Mr. Tillery's decision to make. And, in fact, Mr. Tillery sent his scores to them before he received their scores back. Right. And Mr. Tillery informed who the two finalists were, not including the Stowe, I think before he received their scores. And the very odd bracket that Mr. Tillery gave provisional range scores for Green and then resolved them, giving Green at the higher end of the range and Stowe at the lower end of the range, creating the very amount of point difference that ended up being decisive in the case. So there is some evidence that a jury... I mean, there's also evidence under which the jury could find for the department. But there is evidence drawing inferences in the light most favorable to Ms. Stowe on which a jury could infer that there were some irregularities in this selection procedure. Well, Your Honor, we think that this selection process is very similar to the selection process that this Court upheld in the Fishbaugh case. So you had initial screening based on written qualifications, which is what the agency did here. And then you moved to the more advanced stages of the selection process. And a decision was made based on the strength of the interview responses. And I didn't have a chance to really address this at the outset, but... What do you do with our decision in Hamilton? In Hamilton, there was no evidence at all about... In Hamilton, it was enough for us that the process was subjective. And we didn't go beyond that. What do you do with Hamilton? Hamilton is distinguishable for that very reason, Your Honor. Which is that here, yes, there is a level, there is a degree of subjectiveness, as there would be in any interview. But the questions were focused on the core responsibilities of the position. But the allegation, and remember, we're here at summary judgment. The allegation is that those questions were designed to disfavor her experience. And if you just look at the face of them, that's true. They didn't... None of those questions gave the plaintiff an opportunity to explain, to show her more extensive experience. And also, just like in Hamilton and in the other cases, you know, there was no... I didn't see anything in the record that indicated that the scoring had been validated in any way. There was no difference. Tillery gave no guidance for what was a 1 or a 2 or a 3 or a 4. But he made sure to send around his preferences first. Ahead of time, yeah. This is about summary judgment. Not every case can be decided on summary judgment. All inferences are to be drawn in favor of the non-moving party. We have at least three cases or more in this circuit where I hear all of what you're saying. But you're talking about a final judgment. That's not our role. The question is whether drawing all the inferences in favor of the non-moving party is doubt enough so that the jury can come out in her favor. And I think it's a slam dunk, just so you understand. It is so straightforward if you apply summary judgment standards of review the way we're supposed to. It's a jury question here. You may win, but it's a jury question. There are cases in this circuit that come out both ways. A few on the other side of it, Your Honor, are Adeyemi, Fishbach, Holcomb, and Stewart. So you won't be surprised if this panel decides that, you know what, this should go to a jury. Stewart is a great example, Your Honor. You won't be surprised, right, in light of the law of the circuit and some recent cases that suggest in this kind of a situation we have a very highly qualified person against a person of the other sex, much younger, much less experienced, without the same accolade from the past. In this kind of a situation, you let the jury decide. It wouldn't be a surprise, would it? The cases that have allowed the allow It wouldn't be a surprise, would it, in light of the law of the circuit, right? I disagree. I think on the facts of this case, that would be a deviation from the circuit's precedent because the cases like Acca, Calhoun, Hamilton, Latham, that primarily, the evidence as here, I believe, is primarily focused on the relative qualifications of the candidates. In those cases, the disparity between the selectee and the plaintiff was much more significant than it is here. For that part of the case. So if in my review as a judge of the record suggests you're simply wrong on that, that the disparity is substantial, then you would agree I should vote to send it back, right? Not necessarily. I would not agree, Your Honor, because You were the one who picked where you wanted to go, and if I don't agree with your premise, I thought you would readily say, well, you're right, Ron, you've got to vote to send it back. I think the record shows that she is substantial, on the face of it, substantially better qualified. Whether or not he was minimally qualified or qualified, she was substantially better qualified. And then you have the additional information regarding the declarations, the way he set up the procedure, he votes first and sends his preferences around, it looks like rigging, a jury could find that, I don't know whether that was or was not, that's exactly what juries do. I don't know what more she's supposed to do. She creates a record of the sort that she has, which is outstanding, over many, many years, goes up against someone substantially younger, with nothing like the record that she has, and she's got to face a struggle on summary judgment as opposed to going to the jury? That's not what the law says. If I may, Your Honor, I think it's That's not what the law is. If I may, Your Honor, I think this cuts to the heart of the case. I'd like to just briefly respond to that. Our position in this matter is not that Ms. Stowe was not highly qualified. We recognize that her accomplishments at the Department of Justice were exemplary. No, she was substantially better qualified than the person against whom she was competing, and she faced the problem of a supervisor who clearly was linked. A jury could find, I don't know what the result will be, a jury could find that the supervisor who was acting against her was tilting the system against her. But that doesn't account for, considering all that evidence, the light most favorable to Stowe, as district court did, and as this court would here on review of district court's decision, We aren't defrauding district court. The record does not We're doing this de novo. The record There are three of us, and we're doing it de novo. The district court's conclusion on that is not compelling. It does not determine what we do. Understood, Your Honor, but the district court got it right that the evidence in this case is not even construing all of that evidence in light most favorable to Ms. Stowe. We take it as undisputed. It doesn't account for the fact that Dr. Green, not Mr. Green, Dr. Green, who had a Ph.D. from one of the top programs in the country in material science and engineering, and relevant experience both within the department and outside the department, was a highly qualified individual as well. And our position is that no reasonable jury could look at these two candidates side-by-side, based on their paper applications, not talking about their review responses right now, but based on their paper applications, and say that the disparity between these two candidates was so wide that the only possible inference here is something like discrimination. I'd like to tell you a couple things very briefly about Dr. Green. As I mentioned, he had a Ph.D. in a relevant Which proves nothing other than he has a Ph.D. because we're talking about standards development, standards testing, and experience and prior supervision. The fact that you have a Ph.D. does not necessarily mean that you are either very experienced in or highly qualified in standards development, standards testing, grants programs, or experience. It just shows that you went through a Ph.D. program and that you have a Ph.D. and maybe lots of potential to go with it. Respectfully, Your Honor, the comparison of the two candidates' educational qualifications and background is at the center of this court's analysis and comparative qualifications in almost every case. But in addition to that, you had a candidate, Dr. Green, who had performed a postdoctoral fellowship at NIST, which in this exact field, materials science and engineering, and then when he came to the Department of Justice, he had been there for four years prior to the selection, and the last two of which, he was at the same GS-14 level as Ms. Stowe. Now, I'd like to respond just briefly to a point that Ms. Stowe's counsel made during argument, which is that there was no evidence that Dr. Green had performed work on technology policy. And that's incorrect. The example that Dr. Green provided in the interview, but also that we talked about in our briefs, was Dr. Green's work on the smart gun technology initiative. And this was an initiative that had come down from the White House in 2012 after some of the shootings. Dr. Green was the point person for DOJ on that entire initiative. Just so I can focus this and put it together with what's in the record, which of the five buckets does that go to? I know he talked about that in his response, I think, to two of the questions. Technology policy is your shorthand for which of these? Knowledge of program management principles, or ability to analyze organizational operational problems and develop solutions, or ability to provide advice and guidance on business and program management issues, or ability to supervise, or ability to meet and deal with others in performing supervisory or leadership work. Yes, my recollection is that it was question four, which I believe was the technology policy question. That is in the brief and our discussion of the panelists' recollection of their own scoring. Okay, so technology policy. I didn't mean to slow you down. I just wanted to put it in context, because that is an important answer in his still Donahue activity. Go ahead. Yes, and this technology policy is different from standards development. It's more broad. And this was a question that was asked in the Stowe's Council. Okay, so we recognize that in the area of standards development and conformity assessment, Ms. Stowe had more experience than Dr. Green. But that was only one of the five selection criteria. The difference is that technology policy in this position, just this position, GS15 versus 14, this person would not be developing the standards himself or herself. It's more of a management supervisory role. So it's coordinating the work of other program managers who are developing standards. It's interfacing with different stakeholders in the community, law enforcement, the research and academics, the policy makers, the public at large who's affected by this technology. Dr. Green's responses during the interview reflected that he better understood the distinction between the work that had been the focus of Ms. Stowe's career, which were also the focus of her answer, which was really to narrowly focus on standards development, conformity assessment, and this position, which is more supervisory. It was leadership. It was technology policy at a broader level. So with this smart gun challenge. Mr. Shaffer, let me ask you about, at this point, about the plaintiff's alternative argument, which is that even if you're right that, as you say in your brief, yes, she was better qualified, but not substantially better qualified, even if you're right about that, that there's still enough evidence here to go to the jury because of the declarations alleging gender bias and that the person who expressed that bias is the one who designed the system and allegedly designed the questions to disfavor her. That's their alternative. And what's your basic response to that? That the record does not support the claims. The record does not support the claims or directly contradicts them. Okay. Let me ask you just one other question. When I was asking you about cases that support your view, you mentioned Fishbach, right? Yes. Okay. As I read Fishbach, though, you're right that we said that the plaintiff's superior qualifications were not enough to go to the jury, but in that case, we pointed out that the district court, by the way, which was doing a bench trial, had found no evidence of discriminatory motive at all. That's what Fishbach was about. Am I wrong about that? Whereas here we have the Crossland Declaration. In Fishbach, my recollection, Your Honor, is that the main allegation in that case, which is similar to the allegation that Ms. Doe is making here in terms of this category of evidence, is that she was the victim of poor selection procedures. The district court, she was the victim of what? The victim of poor selection procedures. Of what? Poor selection procedures. Yes. Poor? Poor. Oh, poor. P-O-R. But there's an express finding. In Fishbach, we said the error the district court made was to send this case to the jury without making a finding about motive. That that was the error. Is that wrong? No. Our reliance on Fishbach is for the specific point to respond to Ms. Doe's argument that she was the victim of poor selection procedures. And in that case, the Court said that there's nothing fishy about, and I think the Court said it's objectively reasonable, to have a process designed in a very similar manner to this one, which was written qualifications during this early stage. And you keep saying that, but the difference is that there, there was nothing like the Crossland affidavit. Here there is. That's the difference between the two cases. Well, and a major difference is that there was a trial. Yeah. It wasn't a summary judgment case. So that that plaintiff had an opportunity to go to trial and fail to present evidence of bias, you know, evidence of biased treatment, you know, observation of biased treatment by anybody. In this case, at the summary judgment stage, where the inferences are in the plaintiff's favor, have some evidence of that. Sure. And your response is? No, I don't disagree with that, Your Honor. They are procedurally different. But in, in the, the relevant, the relevant aspect here, which is Ms. Doe's claims about. It's the structuring of the two steps. Yes. And you said, so, so in essence, Stowe might, in your view, have been the victim of, what did you call it? Poor selection. Poor selection procedures, but that does not necessarily equate to sex or age discrimination. And so, but when I had asked you earlier about things that concern me about not just the, having a qualifications paper review and then putting that aside to look only at interview scores, and you pointed to Fischbach as, as supporting that that isn't necessarily discriminatory, but I had, had pointed out that, that Mr. Tillery sent his scores to the others before he got theirs, that he had, in fact, announced who the finalists were, not including Ms. Doe, before he got the other panelists' scores, that there was some evidence that they were really deferring to Tillery and, you know, this was really his call. And then the, the feature of him assigning a range of scores and rounding up from Mr. Green and rounding down to Ms. Stowe. And when I asked you about all those features, I believe your only answer was Fischbach. And I just wanted to give you an opportunity to give a more detailed answer if you have one. Yes, I do, Your Honor. Thank you. Those, first of all, let me respond to the point about evidence in the record that the other two panel members deferred to Mr. Tillery. I don't, I don't believe there is any evidence in the record. In fact, the two other panel members were asked about this at their depositions, and they emphatically stated, no, not in any way were my scores influenced by Mr. Tillery. And in fact, if he had tried to influence my scores, I would have recused myself. That's what Mr. Gillerman stated. The evidence that Ms. Stowe put forward, that the district court looked at and addressed in its very thorough opinion, does not show that there was any effort to signal an intent to not select Ms. Stowe or to influence the other panel members. For example, there was the point before the selection decision, there was the email where Mr. Tillery had wrote to the other two members of the panel. This selection is going to replace the current member of our staff who is serving as the alternate standards executive on that interagency committee. Counsel, the problem is, I'm going back to the same thing I've been saying. That is weighing of the evidence. It's making a credibility determination. That's not what you're supposed to do on summary judgment. So it's not, and it's not like the Fishbone case, which was a bench trial, where the judge does weigh the evidence and make credibility determination. You're exactly right. The trial judge did weigh the evidence and made credibility determination, and that's the problem. And it was wrong. The district court was very careful, Your Honor, to not use that language. The points that Judge Pillen has raised with you, and you're still not answering it because there's no answer, are things that would cause a jury to allow a jury to rule in favor of the plaintiff. They could go the other way, but they couldn't. That's all you need to avoid summary judgment. All the inferences go in her favor. You're not answering. You refer to a case that involved a bench trial, which is totally the opposite. This is summary judgment. I understand that, Your Honor. But it's not inappropriate for a district court, for this Court on its de novo review, to look at the record and ask if it supports an allegation or claim that she's making, A, or B, whether the inference that Ms. Stowe is asking the court to draw is reasonable. What the district court said, which I think you've got it right, was that the inferences that Ms. Stowe is asking the district court to draw were not reasonable inferences. Okay. Okay. Thank you. Thank you. Did Ms. Huth have any time left? Okay. You can take two minutes, if you would like. Thank you, Your Honor. A lot of points to discuss. I'd like to quickly touch on a few of them. I'll start with the order in which I started my discussion on substantial superior qualifications. I would submit to you all that it is a unique situation we find ourselves here where almost all entities involved in this case admit that a jury could reasonably find Ms. Stowe better qualified. I include the government in that, who essentially concedes that in their brief and may have conceded an oral argument today. The district court here recognized that a reasonable jury could find Stowe more qualified. And we would simply submit on this issue of when does that evidence rise to substantially superior when you have both parties admitting or conceding that a jury could find Stowe more qualified. It's the province of a jury to then determine whether that totality of evidence rises to the level of substantiality. On the points turning to the second issue of pretext, I do want to point out that, you know, there are lots of subtle factual differences in the panel selection process here versus the one in Salazar versus the one in Ioha because, you know, people have different names and they have different backgrounds and the questions are worded slightly differently and there's nine questions there and only five questions here. But we had Salazar, the judges thought, was a close case. We would submit our evidence here is much greater in Stowe's favor than what Salazar offered. And in particular, I want to note that here, and we discussed this in our brief, there was evidence from which the jury could infer not only that Tillery had the ability to influence the other panelists, but that he did influence the other panelists as you all pointed out with exchanging the grades ahead of time. No, he acted in a way that a jury might conclude that he intended. It's different. We don't know whether he did or what. That's right. And, Your Honor, the only thing I wanted to add was that in addition to that evidence, there was evidence in the record from which a jury could doubt the veracity of the other panelists' scoring. I'll just make a note. Ms. Swineford is a perfect example. Ms. Who? Swineford. Yeah, right. The other panelist. She was not a technical expert on testing and all that stuff, but she was the point person on grants. That was her area of expertise. If you look at the scoring, her scoring of Greene versus Stowe, she puts Greene way out in front of Stowe. And she testified at her deposition that the one area that Greene had outperformed Ms. Stowe was on grants management. But then you go back and you look at her scores on the question number three dealing with grants management, she scores the two the same. So there's a lot of evidence in the record, not just that Mr. Tillery had the ability to influence, but that a jury could doubt the veracity and the legitimacy of the other panelists' scores. I would just ask, what about Mr. Tillery's apparent championship of Ms. Stowe trying to do the desk audit, get her job upgraded, advising her to get more supervisory experience, and really in some ways a jury could conclude being a mentor and a sponsor to her up to a point? Well, Your Honor, I think you're right. I mean, a jury could certainly construe that that way and could say, oh, there was a point in time when he advocated for her on certain things. I don't think a jury would be required to find that Mr. Tillery really was an advocate for Stowe on the GS-15 desk audit issue. Ms. Stowe testified she never really believed that he was behind her on that and had slow-walked it. But in any event, I want to make the point that for some discriminators, it's very different to have some lady in the corner office doing her science stuff and give her that GS-15 pay grade because she's been doing that GS-15 work for many years, and it's hard to really deny it. That's different than giving her the division director position and making her the official supervisor of the other men in the division. How many men and who are they that she would be supervising? So these were all program managers. They were GS-13s, GS-14s. And in her side of the division, the standards and testing side, it was all men. And are they engineers? Are they former law enforcement? Do we know anything about the nature of these people? They have science technology backgrounds because this is such, obviously, a science-dominated position, but whether they have Ph.D.s. Mr. Hart did have some law enforcement background. I really don't know, Your Honor, in terms of the specifics on the other peers of hers. Thanks. Thank you so much. Thank you. The case is submitted.
judges: Tatel, Pillard, Edwards